THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
RODNEY L. WENINGER, Defendant-Appellant.

Third District    No. 3—92—0346

Opinion filed March 30, 1993.

STOUDER, J., dissenting.

John Malvik, of Williams, Buckrop, Malvik & Associates, of Rock Island, for appellant.

Marshall E. Douglas, State's Attorney, of Rock Island (John X. Breslin and Rita Kennedy Mertel, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE McCUSKEY delivered the opinion of the court:

Following a bench trial, the defendant, Rodney L. Weninger, was convicted of two counts of aggravated criminal sexual assault (Ill. Rev. Stat. 1991, ch. 38, par. 12—14(b)(1)) and one count of criminal sexual assault (Ill. Rev. Stat. 1991, ch. 38, par. 12—13(a)(3)). The victim, T.W., was the defendant's 10-year-old adopted daughter. The defendant was subsequently sentenced to concurrent terms of 15, 15 and 12 years' imprisonment.

The defendant raises two issues on appeal: (1) whether the evidence presented was sufficient to prove him guilty of the offenses beyond a reasonable doubt; and (2) whether the trial court erred in allowing T.W. to testify by means of closed circuit television, out of the presence of the defendant, pursuant to section 106B—1 of the Code of

Criminal Procedure of 1963 (Code) (Ill. Rev. Stat. 1991, ch. 38, par. 106B—1). We affirm.

Following several continuances, a bench trial was set for February 18, 1992. At a hearing five days prior to trial, the prosecutor orally informed the court and defense counsel that she would be filing a motion to present the testimony of T.W. by means of closed circuit television. Section 106B—1 of the Code allows for this procedure in certain limited circumstances. Section 106B—1 of the Code became effective on January 1, 1992. A written motion was subsequently filed by the State and a hearing regarding the motion was held on the trial date.

Butch Bos testified that he was an electronics technician. He said he could provide the necessary equipment to allow T.W. to testify by means of closed circuit television. Bos indicated that a television camera would be placed in the judge's chambers. Also, he said a television monitor would be placed in the courtroom where it could be viewed by the defendant. The defendant and his counsel could communicate with each other during T.W.'s testimony by the use of an intercom system sensitive enough to pick up the slightest whisper.

Marcia Rexroat testified that she had a bachelor's degree in nursing and a master's degree in mental health nursing. Rexroat had been working for 13 years with the Sexual Abuse Treatment Program providing therapy for victims of sexual abuse and their families. She had provided T.W. with about 12 hours of individual therapy. Rexroat stated that T.W. had a very sad facial appearance, cried easily, suffered from sleep disruption, had a decreased appetite, suffered from headaches, stomachaches, and was not performing well in school. Rexroat testified that T.W. continued to have an intense fear of the defendant. Rexroat said T.W. feared that the defendant would try to look at her or "get her." Rexroat stated that T.W.'s family did not believe her accusations concerning the defendant and that T.W. had been removed from her home. Rexroat indicated that it was difficult to discern whether T.W.'s symptoms were caused by the sexual abuse or by the rejection and abandonment T.W. felt as a result of being removed from the family.

Rexroat indicated her fear was that T.W.'s symptoms would increase if T.W. testified in front of the defendant. Rexroat stated that "minimally those symptoms may increase." She also testified that, while it may be therapeutic for a child of 12 or 13 to confront the offender, she thought that it would be a high risk for T.W. Rexroat stated that T.W. would be able to testify in the defendant's presence, but the ultimate question was whether it would be good for her. Rex-

roat stated that it was the presence of the defendant, and not the courtroom, which would be traumatic for T.W. T.W. had previously testified in a juvenile court proceeding. However, that testimony was not given in the presence of the defendant. Rexroat indicated that T.W. had been slow to respond to treatment. Rexroat's fear was that, if T.W. had to testify in the defendant's presence, it would extend the period of rehabilitative treatment in response to the trauma suffered in connection with these events. Rexroat stated that she was concerned about the possibility of depression, which can lead to suicidal ideation and self-mutilation. However, Rexroat acknowledged that T.W. was not presently exhibiting those symptoms.

Following Rexroat's testimony, the trial court found that the requirements of section 106B—1 of the Code had been met. Therefore, the trial court ordered that T.W.'s testimony could be presented by means of closed circuit television. Pursuant to the trial court's ruling, T.W. testified in the judge's chambers during the bench trial.

T.W. was the 10-year-old niece of the defendant's wife. T.W.'s mother died when T.W. was four years old. T.W. was then adopted by the defendant and his wife. The defendant and his wife had three other children, two boys and a three-year-old girl. They had operated a day care in their home for about three years. The defendant's wife also worked part time outside the home. In August 1991, their license to operate the day care was suspended after the Department of Children and Family Services (DCFS) received a report of possible sex abuse. The defendant then left the home and began living with his mother.

T.W. testified that her father began doing "sexual stuff" to her when she was about six or seven years old. He told her not to tell or he would "whip" her. On several occasions, T.W.'s father had her "suck on his private." These incidents occurred in the basement laundry room or in her father's bedroom. T.W. stated that her parents had separate bedrooms. The defendant also attempted several times to place his finger and his penis in T.W.'s vagina. T.W. said that the defendant's acts hurt her. She testified that one incident occurred when she was watching television in the basement. T.W. said her father took her into the basement bathroom where he was doing remodeling work. The other children were upstairs, and her mother was at work. The defendant pulled down her pants and underpants, put "green jell stuff" on her front and her "bottom" and then placed his penis into her "butt." T.W. testified the defendant continued doing that until "white stuff" came out of his penis which he then wiped on a towel.

After this incident, T.W. told her cousin, Roger Yarrington, that her father was doing sexual stuff to her. T.W. asked him to tell her mother. T.W. stated that she had also told her brother Shannon and her friend Sunshine about the abuse. T.W. told Roger that she was lying after her mother told her that such accusations would cause her father to go to jail and they would lose their house and the day care business. When her father found out what T.W. said, he "whipped" her. After T.W.'s mother took her to the doctor, she was removed from the home by DCFS. T.W. stated that once she had seen part of an X-rated movie in her home. T.W. admitted that she lied in the juvenile court proceeding when she testified that she had never watched an X-rated movie. T.W. explained that she was afraid she would get in trouble if she admitted watching the movie.

Dr. Eden Aurelio testified that he examined T.W. on August 5, 1991. Dr. Aurelio stated that her hymen was intact. However, he observed redness and swelling in the back area of her vagina. The doctor said that this condition was known as "vaginitis" and was not common for a child T.W.'s age. The doctor also testified that the redness could have been caused by sexual abuse. He further stated that there were other possible causes, including infection or allergies. Dr. Aurelio opined that sexual conduct with a child's vagina, such as attempted sexual intercourse, can occur without causing injury to the hymen. The doctor called DCFS following T.W.'s examination.

The defendant denied having any sexual conduct with T.W. He admitted that he kept numerous sexually explicit videotapes in his home. He said they were kept in his bedroom so the children could not watch them. The defendant said that the bottle of green lotion, labeled "Body Liqueurs for Lovers" which was found in the basement bathroom, had been given many years ago as a gag gift to him and his wife. The defendant asserted he never used the lotion after he received it. The defendant admitted he "whipped" T.W. after she told his wife that he had been sexually abusing her. Both the defendant and his wife testified that T.W. had often been disciplined for lying. The defendant's wife stated T.W. previously had problems with vaginitis after she ate or drank something acidic. However, she admitted T.W. was never medically treated for this condition.

The trial judge found the defendant guilty of two counts of aggravated criminal sexual assault and one count of criminal sexual assault. The trial judge stated that he found T.W. to be a credible witness. The trial judge noted that T.W.'s testimony was corroborated by: (1) the doctor finding redness in her vaginal area; (2) her reports to Roger, her brother and her friend; and (3) the presence of the green lotion in

the basement bathroom. Additionally, the trial judge noted that T.W. recanted her story only once, after her mother warned her of the possible consequences. The trial judge additionally noted that T.W. had consistently maintained her original story following her mother's warning. The trial judge also found that T.W. gave a reasonable explanation as to why she lied in juvenile court about viewing an X-rated movie. Finally, the trial judge specifically stated that he did not believe the defendant's testimony.

On appeal, the defendant argues the evidence was not sufficient to find him guilty beyond a reasonable doubt because T.W.'s testimony was not clear and convincing and was not sufficiently corroborated. The defendant argues that T.W.'s credibility was impeached by the fact she recanted her accusation and by the fact she admitted lying under oath during the juvenile court proceedings. The defendant also argues there was no medical corroboration because the doctor testified that there could be many causes for T.W.'s vaginitis. We disagree with the defendant's analysis and reasoning.

When the sufficiency of the evidence is questioned in a criminal case, including cases involving sex offenses, the test to be employed upon review is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Schott* (1991), 145 Ill. 2d 188, 202-03, 582 N.E.2d 690, 697; *People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 277.) There is no longer a requirement that a sex-offense victim's testimony be clear and convincing or substantially corroborated. (*Schott*, 145 Ill. 2d at 202, 582 N.E.2d at 696.) Also, it is the responsibility of the trier of fact to determine the credibility of the witnesses and the weight to be given to their testimony. *People v. Steidl* (1991), 142 Ill. 2d 204, 226, 568 N.E.2d 837, 845; *People v. Hudson* (1990), 198 Ill. App. 3d 915, 923, 556 N.E.2d 640, 646.

■ Based on the *Collins* standard of review, we conclude the evidence was sufficient to find the defendant guilty of the offenses beyond a reasonable doubt. T.W. described in some detail the sexual assaults committed by the defendant. The trial judge, as the trier of fact, found T.W. to be a credible witness. The trial judge specifically found there was a reasonable explanation for the fact T.W. initially recanted her accusation and for the fact that T.W. lied about seeing an X-rated movie during the juvenile court proceedings. The trial judge also determined T.W.'s testimony was corroborated by: (1) the medical testimony; (2) her reports to other people concerning the defendant's conduct; and (3) the presence of the green lotion in the basement. In

addition, the trial judge specifically found the defendant was not a credible witness. Consequently, the trial judge found the essential elements of the crime were proved beyond a reasonable doubt. We agree with the trial court's findings.

The defendant additionally contends the trial court erred in allowing T.W. to testify by closed circuit television. The defendant, for the first time on appeal, contends that Rexroat was not adequately qualified as an expert witness. We conclude the defendant has waived any issue regarding Rexroat's qualifications by failing to raise that issue in the trial court. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1130.) We additionally note, however, that Rexroat was clearly qualified to give an opinion in this case. She had a master's degree in mental health nursing and 13 years' experience in providing therapy for victims of sexual abuse. Finally, she had personally spent 12 hours providing therapy to T.W.

The defendant also argues that Rexroat's testimony was speculative. Therefore, the defendant alleges that it was not sufficient to support the trial court's conclusion that T.W. would suffer severe emotional distress which is likely to cause her to suffer severe adverse effects if she testified in the presence of the defendant. We disagree with the defendant's review of the record and his interpretation of the statute in question.

The Supreme Court has recently found that "a State's interest in the physical and psychological well-being of child abuse victims may be sufficiently important to outweigh, at least in some cases, a defendant's right to face his or her accusers in court" pursuant to the confrontation clause of the United States Constitution (U.S. Const., amend. VI). (*Maryland v. Craig* (1990), 497 U.S. 836, 853, 111 L. Ed. 2d 666, 683, 110 S. Ct. 3157, 3167.) The Supreme Court found constitutional a Maryland statute which allows the use of the closed circuit television procedure where a determination was made that the child witness will suffer *"serious emotional distress such that the child cannot reasonably communicate."* (Emphasis added.) *Craig*, 497 U.S. at 856, 111 L. Ed. 2d at 685, 110 S. Ct. at 3169.

Section 106B—1 of the Code was enacted following the *Craig* decision and provides, in pertinent part:

> "In a proceeding in the prosecution of an offense of criminal sexual assault, aggravated criminal sexual assault, criminal sexual abuse or aggravated criminal sexual abuse, a court may order that the testimony of a child victim under the age of 18 years be taken outside the courtroom and shown in the courtroom by means of a closed circuit television if:

(i) The testimony is taken during the proceeding; and

(ii) The judge determines that testimony by the child victim in the courtroom will result in the child suffering serious emotional distress such that the child cannot reasonably communicate *or that the child will suffer severe emotional distress that is likely to cause the child to suffer severe adverse effects.*" (Emphasis added.) Ill. Rev. Stat. 1991, ch. 38, par. 106B—1(a)(1).

The trial court in the instant appeal determined that T.W.'s testimony could be presented by closed circuit television based upon that portion of the statute which we have emphasized. Our review of the record indicates that the trial court made no finding that T.W. could not reasonably communicate. However, instead, the trial court reached its ultimate decision based upon its finding that T.W. would suffer severe emotional distress that is likely to cause the child to suffer severe adverse effects.

Rexroat testified T.W. continued to have an intense fear of the defendant and that it was the presence of the defendant, and not the courtroom, which would be traumatic for T.W. Rexroat also stated that testifying in the presence of the defendant would be "high risk" for T.W. Rexroat was concerned that "minimally" T.W.'s symptoms would increase and her period of treatment would be even longer. Rexroat further testified she was concerned about the possibility of depression, which could lead T.W. to suicidal ideation and self-mutilation. We conclude that the obvious import of Rexroat's testimony is that serious adverse effects were likely if T.W. testified in the presence of the defendant. Rexroat stated that, at a *minimum*, an increase in T.W.'s many symptoms could be expected and that more serious adverse effects were also possible.

The defendant asserts that Rexroat's testimony was not sufficient because she did not testify that T.W. would suffer severe emotional distress. The defendant notes that Rexroat only testified concerning the possible harm that was likely to occur if T.W. testified at trial in the presence of the defendant.

We find that the portion of section 106B—1 of the Code in question only requires testimony sufficient to support the trial court's finding that the child will suffer severe emotional distress that is *likely* to cause the child to suffer severe adverse effects.

■ Our review of the record shows that expert testimony was presented which was sufficient to support the trial court's determination. Rexroat's testimony, including her statements that T.W. had an intense fear of the defendant and that testifying in the presence of

the defendant would be traumatic for T.W., was sufficient to support the trial court's finding. See *State v. Crandall* (1990), 120 N.J. 649, 656, 577 A.2d 483, 486 (testimony of the child and her mother that the child feared the defendant was sufficient for a finding that the closed circuit television procedure should be used).

The defendant also asserts, however, that section 106B—1 of the Code is unconstitutional because it is overbroad and vague. The defendant does recognize that the Supreme Court in *Craig* approved a Maryland statute which provided for a closed circuit television procedure. The defendant points out, however, that Maryland's statute requires a determination that the child witness will suffer serious emotional distress such that the child cannot reasonably communicate. While the Illinois statute has also included this language, *it also provides an additional basis for allowing the use of closed circuit television testimony*. The defendant contends that this additional basis, relied on by the trial court in this case, is unconstitutional because it provides no standard of measure for the required serious emotional distress. The defendant argues that the statute does not include a definition of the terms relating to severe emotional distress or any standards for determining what constitutes "severe adverse effects."

We agree with the State that the defendant's argument only challenges the statute on the grounds of unconstitutional vagueness. A "statute is unconstitutionally vague if its terms are so ill defined that their meaning will ultimately be determined by the opinions and whims of the trier of fact rather than any objective criteria." (*People v. La Pointe* (1981), 88 Ill. 2d 482, 499, 431 N.E.2d 344, 352.) A court will assume, however, that the words used in a statute have their ordinary and popularly understood meanings, absent a contrary legislative intent. (*People v. Fabing* (1991), 143 Ill. 2d 48, 54, 570 N.E.2d 329, 332; *La Pointe*, 88 Ill. 2d at 499, 431 N.E.2d at 352.) Also, in addition to the language used, consideration must be given to the legislative objective and the evil the statute is designed to remedy. (*Fabing*, 143 Ill. 2d at 54, 570 N.E.2d at 332; *La Pointe*, 88 Ill. 2d at 499-500, 431 N.E.2d at 352.) We recognize that all statutes are presumed constitutional, and the burden of establishing constitutional infirmity is on the party challenging the statute. *Fabing*, 143 Ill. 2d at 54, 570 N.E.2d at 332.

■ Based upon these principles, we conclude that the statute in question is adequate to defeat the defendant's challenge to its constitutionality. The legislative objective of the statute is to protect the physical and psychological well-being of child abuse victims. (See *Craig*, 497 U.S. at 852, 111 L. Ed. 2d at 683, 110 S. Ct. at 3167.) The

descriptive words used in the challenged phrase of the statute are commonly used words with ordinary and popularly understood meanings. The words used provide sufficient direction for the trial court to determine whether the closed circuit television procedure is necessary to protect the child witness in a particular case. See *La Pointe*, 88 Ill. 2d at 500, 431 N.E.2d at 352.

Accordingly, we conclude the defendant has failed to meet his burden of establishing that the statute is unconstitutionally vague. We additionally note that courts in other jurisdictions have found similar statutes constitutional. See *State v. Self* (1990), 56 Ohio St. 3d 73, 79-80, 564 N.E.2d 446, 452-53; *People v. Guce* (1990), 164 A.D.2d 946, 948, 560 N.Y.S.2d 53, 56; *State v. Crandall* (1990), 120 N.J. 649, 661, 577 A.2d 483, 488.

For the reasons indicated, the judgment of the circuit court of Rock Island County is affirmed.

Affirmed.

SLATER, J., concurs.

JUSTICE STOUDER, dissenting:

I do not agree with the majority that the testimony of Marcia Rexroat was sufficient to support a finding that T.W. would suffer severe emotional distress that is likely to cause her to suffer severe adverse effects if she testified in front of the defendant. The only logical inference that can be gleaned from Rexroat's testimony is that any possible effects on T.W. would be minimal. The majority characterizes Rexroat's testimony as "Rexroat stated that, at a *minimum*, an increase in T.W.'s many symptoms could be expected and that more serious adverse effects were also possible." (243 Ill. App. 3d at 726.) Rexroat's testimony was actually as follows:

"Q. Can you anticipate at all the degree of injury that could occur?

* * *

A. I guess minimally an increase in the symptoms that I have listed, the symptoms that she's already displaying. And, that everyone has worked hard at remedying without lots of success. I would say that minimally those symptoms may increase."

I have been unable to locate in the record where Rexroat stated that more serious adverse effects were also possible. Also, it must be

noted that Rexroat stated that her testimony would be the same for *any* victim of sexual abuse under the age of 12.

The statute in this case seeks to limit a defendant's constitutional right of confrontation, and therefore I believe its terms should be strictly construed. The statute clearly requires a finding that the victim *will* suffer *severe* emotional distress that is likely to cause her to suffer *severe* adverse effects. I fail to understand how the majority equates the above testimony with the finding required by the statute.

The majority states that the "obvious import of Rexroat's testimony is that serious adverse effects were likely if T.W. testified in the presence of the defendant." (243 Ill. App. 3d at 726.) This assertion by the majority eviscerates the finding required by the statute. As the defendant correctly notes, the finding that the victim will suffer severe emotional distress is a prerequisite to finding that she is likely to suffer severe adverse effects. The majority's response to this argument by the defendant is ineffectual at best because the majority only considers the latter part of the necessary finding. The majority is correct that the "severe adverse effects" need only be "likely," but a finding that the victim *will* suffer severe emotional distress is necessary first.

Criminal statutes must be strictly construed in favor of the accused and nothing should be taken by intendment or implication beyond the obvious or literal meaning of the statute. (*People v. Shinkle* (1989), 128 Ill. 2d 480, 539 N.E.2d 1238.) The language of the statute must be given its plain and ordinary meaning (*People v. Sangster* (1982), 91 Ill. 2d 260, 437 N.E.2d 625), and the court may not, by subtle construction, alter the plain meaning of the words employed. (*People v. Goldstein* (1990), 204 Ill. App. 3d 1041, 562 N.E.2d 1183.) It is clearly improper for the majority to take the term "likely" from the latter part of the clause in question and apply it to the earlier part where the statute plainly uses the term "will." The majority has, by subtle construction, altered the plain meaning of the statute. Rexroat's testimony, when construed in the manner required by the statute, was insufficient for the court to find that T.W. would suffer severe emotional distress likely to cause severe adverse effects.

The majority also states that "Rexroat further testified she was concerned about the possibility of depression, which could lead T.W. to suicidal ideation and self-mutilation." (243 Ill. App. 3d at 726.) What Rexroat actually said was that suicidal ideation and self-mutilation are symptoms that sometimes occur following childhood depression. Rexroat admitted that T.W. had not exhibited any such symptoms. The statute in question plainly requires a finding that the particular victim

in a specific case will suffer severe emotional distress likely to cause severe adverse effects. It is clearly erroneous for the majority to suggest that testimony regarding the symptoms experienced by depressed children in general can be used to support the individualized finding required by section 106B—1. In fact, if such testimony regarding depressed children in general could be used to supply the necessary finding, then the statute has been rendered meaningless because such testimony would justify the limitation on confrontation in any case.

Further, Rexroat's testimony that T.W. feared the defendant was insufficient to supply the necessary findings. In any child sexual abuse case the victim would probably fear the defendant. That is not the proper inquiry. The proper inquiry concerns what effect testifying in the presence of the defendant will have on the victim. In response to that question, Rexroat testified that minimally T.W.'s symptoms *may* increase. The majority cites a New Jersey case, *State v. Crandall* (1990), 120 N.J. 649, 577 A.2d 483, for the proposition that testimony that the victim feared the defendant was sufficient for a finding that the closed circuit television procedure should be used. The majority's reliance on this case in support of its position is misleading. First of all, the issue is whether the Illinois statute was correctly applied to the facts of this case. Clearly, any decision by the New Jersey Supreme Court cannot be relevant on this matter, particularly when the New Jersey statutory scheme is not even discussed. Further, the decision in *Crandall* was based on the testimony that, if forced to face the defendant in the courtroom, the victim would "clam up and say nothing." (*Crandall*, 120 N.J. at 656, 577 A.2d at 486.) The discussion regarding the victim's fear of the defendant concerned whether the requirements established by the Supreme Court's decision in *Craig* had been met, and had nothing to do with a finding of severe emotional distress.

Because there was no evidence introduced in this case that the victim would suffer severe emotional distress likely to cause severe adverse effects if required to testify in the presence of the defendant, I would reverse and remand the cause for a new trial. Use of the closed-circuit television procedure under the facts of this case violated the defendant's sixth amendment right to be confronted with the witnesses against him. The majority has seriously undercut the statute by holding that the necessary findings were supported by the speculative testimony in this case.

Accordingly, I dissent.